May it please the Court, Clerk Gehenno, Pro Bono Counsel for Petitioner Steven Wayne Griffiths. I would like to reserve two minutes for rebuttal, please. We ask the Court today to affirm its long line of precedent evaluating CAD claims and to reverse the BIA's decision and remand for further consideration applying the correct legal standards. The BIA misapplied the law and it misapprehended the very evidence on which it relied. I will focus today on three ways in which the BIA erred in denying Mr. Griffiths' CAD claim. First, the BIA applied the asylum and withholding standard and failed to aggregate Mr. Griffiths' risk of torture as is required under the Convention Against Torture. Second, the BIA disregarded this Court's decision in Ornelas Chavez when it required that Mr. Griffiths show that he had reported the abuse to the police to demonstrate government acquiescence to his torture. It then compounded the error by failing to treat Mr. Griffiths' past torture as the principal factor in evaluating his risk of future torture. And finally, the BIA erred in its assessment of the country conditions in Jamaica, essentially disregarding this Court's decision in Bromfield. Counsel, I'm going to start with a question about Bromfield. Even though the claims are similar, they deal with Jamaica and they deal with gay men, the It appears to me, at least, that the country conditions reports that were in evidence in Bromfield are quite distinct from the country conditions report here many years later, and so I'm not really sure, and I'd like your comment on this, how much, if any, reliance we can place on Bromfield's conclusion that the record there compelled a certain finding when the record is a different record. Your Honor, respectfully, we don't agree that the record is that different in Jamaica today. Homosexual acts are still prohibited by law and punishable by prison. There's extensive record evidence in this record of police ignorance and sort of, you know, turning a blind eye, willful blindness to violence against gay men, and also of police participation in violence against gay men. The BIA hinged its analysis on two reforms, two very dated reforms, the creation of a commission in 2010 to generally sort of look at violations of human rights not directed at the LGBTQ community, and a 2011 policy on diversity. It didn't look at all at the effectiveness of these reforms, and if it had, it would seem that there would have been... There was a lot more in the record, though, it seems to me, in the earlier country conditions report, a lot more terrible things that were described that were absent from the more recent report, and while that might not be a complete turnaround, that isn't really the question for us. It's only whether the current conditions, as shown in this record, compel a finding that's different from the agency's. Your Honor, I don't want to get into a competition of sort of comparing violent acts in the Bromfield record to now, but I do think it's worth noting there's evidence, you know, of a murder in 2017 of the face of gay pride, of beatings, stabbings, shootings, mob violence against gay men in Jamaica. The 2017 UK Home Office report that is evaluating the very reform on which the BIA relied found that it failed to prevent and protect against violence and discrimination. It notes that police officers are sometimes the perpetrators of violence, and that they have failed to intervene in attacks to arrest suspects and to investigate homophobic crime. That is willful blindness. That demonstrates government acquiescence to the torture of gay men, and that shows that Jamaica remains as dangerous today for gay men as it was in Bromfield when this Court held that the Jamaican government acquiesces to the torture of gay men. Bromfield didn't actually say that the CAT claim had to be granted, though, right? It just remanded? I mean, it found the government acquiescence prong, but it didn't find more than 50 percent likelihood prong. You're right. It found the acquiescence piece, and then it remanded to consider whether the petitioner there was more likely than not to face torture, was sort of a heavy-handed suggestion and a clause at the end of the remand pointing to the mob violence and beatings of gay men in Jamaica. I think it's also important to focus on the legal standards that were applied here. The BIA held Mr. Griffiths to a higher standard than is applicable for the CAT claim. It required that he show first an individualized risk and then completely disaggregately consider whether there was a pattern or practice of violence against gay men in Jamaica. Well, I mean, they had – there's some sloppy language in the opinion, no doubt. But I mean, when they state the conclusion – and I'm looking at the very last paragraph or the last substantive paragraph of the opinion on page 6 – you know, we concluded it's not demonstrated that it's more likely than not that he'll be subject to torture by with the acquiescence of a public official. You don't dispute that that's the correct legal standard, do you? Your Honor, we don't dispute that that's the correct legal standard, but we don't think that's the standard that the BIA actually applied throughout its decision. It makes passing references to the CAT standard, but it quite clearly goes through a separate analysis first looking at individualized risk, which is simply not the standard. The BIA looked at whether he was likely to face the same abusers, which is just not what Well, no, that is – that is – I agree that that doesn't make much sense because he was a child in boarding school and he's no longer a child 40 years later. But the passage of 40 years is pretty significant in terms of a nexus between what happened to him then and what might happen to him now, 40 years later, where he's no longer vulnerable, he's no longer likely to be even in touch with the people who tortured him at the school. So isn't that an appropriate thing to consider or a permissible thing to consider in terms of the likelihood of repetition? Your Honor, we – as an initial matter, I disagree with the assessment that he's no longer vulnerable. He is now confined to a wheelchair, and so although he's not a child, that makes him Moreover, this Court has held in Avendano – But he will not be in touch with the people who presumably he doesn't have to be if they even know he exists or he knows they exist at this point. So it would have to be other actors, presumably, or it's permissible for – let me just say it seems to me permissible for the BIA to conclude that it would be other actors, if any, and not the teacher or headmaster or whatever it was at the school. And the passage of time also is generally pertinent, is it not? Your Honor, I recognize it would be other actors, but this Court held in Avendano that absent changed circumstances, if an individual has been tortured before, it is more likely than not that he will be tortured again if he is forced to return to the school. But there's a presumption, but it's not a conclusive presumption. I mean, 60 years, 70 years, somebody was three when they left, and now they're 73. I mean, that's different than this happened two years ago, isn't it? Your Honor, I agree that it's a presumption, and that alone is not sufficient, but here we don't think the government has rebutted that presumption. And that comes back to what we were talking about earlier, of the extensive evidence of indeed participation in such violence. A report from 2019, the 2019 State Department, which this Court has found is generally a very persuasive authority, found that there continued to be the same number of homophobic acts against gay men in Jamaica, and that there was still severe underreporting precisely because of a fear of police inaction, again, government acquiescence to the torture of gay men. Maybe I missed this in the record, but was the school, going back to the past torture, was it a state-run school? Your Honor, I don't think, I think the record establishes that it's a private school. I can confirm that, but I don't think it was a state act. It was not that the abuse was by the government, but it was a government acquiescence? Correct. There was no argument. Although it was not reported, as I understand it, or it's unclear from the record whether it was ever reported beyond the school itself. Yes, the record is mixed on whether it was reported to the police. The testimony is not clear on this issue, but this Court has quite clearly held in Ornelas Chavez that that is not the standard in finding government acquiescence. And indeed, there's good reason for that, and the Court, in an asylum case, Fringas talked about the reason. You can't expect a 16-year-old child in a country where police are known for abusing gay men to report that abuse to the police. That is why the standard is willful blindness or acquiescence, and we respectfully think that there is extensive evidence of that, which I have discussed. There is no indication that the BIA considered that in making the acquiescence finding. It relied only on the lack of report to the police, and its language is quite clear about this on the second page of its opinion. And we think that this alone merits remand for the BIA to consider the full evidence of acquiescence, which then would show that Mr. Griffiths was the victim of past torture, which should have been the principal factor in evaluating his risk of future torture. So that very finding, the sort of basing the acquiescence finding on the lack of the report to the police, set off a series of errors, which led to the incorrect decision in this case. Your Honor, returning to the argument about applying the wrong standard, so it's one that it held him to this higher burden with the individualized risk, and then it is the failure to aggregate the risk. That is the key to Catt's standards. Catt makes clear that you should consider all the evidence of the record and aggregate the risk of torture for the petitioner. Here, when you look at that full picture, when you look at his past torture, which again, under Avendano, is the principal factor which the court should consider in evaluating his risk of future torture. When you look at his present condition, openly gay and confined to a wheelchair, and when you look at the current country conditions in Jamaica, where again, homosexual acts continue to be criminalized, I mean, that sets this case apart from even Bringas and Avendano, where this court warned against placing undue weight on legislative reforms. We don't even have legislative reforms. It continues to be a criminal act. But the criminality of an act does not equate to torture. For example, as abhorrent as we may think it is, if someone were arrested and put in I don't think we would consider that torture under our case law, even though our laws are different than that. So I'm not really sure what criminalization per se means for a claim under Catt. Your Honor, I think criminalization speaks also to the government acquiescence to the torture, as this court held in Bromfield. Why is that true? I mean, we criminalize, you know, purse snatching, but we don't necessarily that isn't that doesn't mean the government is happy when someone beats up a purse snatcher. I just don't see that linkage logically without specific evidence. So I think it is an indicator of how the government views homosexuality. And then when you combine that with the evidence of, for example, in 2015, an angry mob stoning a young man yelling homophobic slurs, or in 2017, the murder of Dexter Pollinger, or there's instances at Record 384 of violence, rape, and other horrific acts against the LGBTQ community. A survey from 2016 at AR 326 says that the number of people in Jamaica who hate or reject homosexual relationships had actually risen 20% since 2011, which speaks again to the fact that Jamaica today is just as it was in Bromfield. Another survey in 2017 found that 60% of Jamaicans would harm an LGBT person who approached them. But the board, I mean, the board didn't go through with this level of specificity, but the board acknowledged a lot of this evidence, right, and reached the conclusion that despite all of that, you know, it doesn't establish that somebody is more likely than not, that somebody in a petitioner's position is more likely than not to be tortured. So what, I mean, I'm still trying to see how we get from, you know, this evidence, as bad as it is, which the board acknowledged, to saying that, you know, the record compels a conclusion contrary to the one the board reached. Your Honor, we think the board made the precise mistake that this court warned again in bringing us in Avendano by over-relying on small reforms to discount extensive evidence of violence. In Bringas, the court cautioned against failing to consider the difference between a country's enactment of remedial laws and the eradication of persecutory practices. The board here cites only these two reforms that are not even remedial laws. In Avendano, this court held that the BIA's decision was fundamentally flawed where it relied on legislative reforms to discount evidence of continued violence against transgender people in Mexico. So that is the error in the evaluation of the country conditions. It's placing undue weight on two reforms that are not proven to have any effect on the actual lives of gay people in Jamaica, and to discount the evidence that I've described today of torture, beatings, stonings, rape, with police acquiescence and indeed sometimes participation in that violence. I see that my time is up. We'll still give you two minutes for rebuttal. Great. Thank you, counsel. Thank you. Let's hear from the government. May it please the court. My name is Jonathan Robbins, and I'm here on behalf of Merritt Garland, the United States Attorney General. Good morning to all of you. The key question in this case is whether the record compels reversal of the agency's denial of petitioner's application for protection under the Convention Against Torture. And as has just been discussed, the record contains a great deal of evidence about the difficulties that the LGBTQ community faces in that country. But the agency in this case did reasonably reach the conclusion that the evidence in the record was insufficient to demonstrate the clear probability standard that the petitioner would more likely than not face torture by the Jamaican government or with the consent or acquiescence of a Jamaican official. I think it's useful to sort of look at the two sort of primary portions of evidence that establish his claim. So the first sort of section of evidence that he's relying on is his testimony in which he details that he was sexually abused at this private boarding school about 40 years ago. And the agency explained that there were really two fundamental problems with relying on this evidence to answer the ultimate question of whether he faces a more likely than not likelihood of torture. The first problem is that the harm itself, while I certainly don't mean to suggest in deplorable harm, it's obviously any time somebody is sexually abused, particularly a child, it's deplorable. But not all deplorable harm constitutes torture. There's a state action requirement. He has to demonstrate in order for this to constitute past torture that the Jamaican government either perpetrated the harm or that they consented or acquiesced to the harm. And as I heard my colleague concede in the opening presentation, his testimony on that really didn't illuminate that. Now, they alluded to the notion that the board somehow or the immigration judge somehow required them to report in violation of Bringus-Rodriguez, but that's not accurate. In Bringus-Rodriguez, that involved a child who did not report. During his testimony, he claimed he did report this. And that's important because when we're looking at whether or not there was acquiescence, the agency has an obligation to assess whether there would be—what has happened in the process as to whether the government would consent or acquiesce in the future. But there's no evidence, is there, that the report went to the police, in this case. Am I right about that? Not quite. It's not clear. He seems to equivocate on whether the police actually got a report or not. At one point he claims they did, but then later on he claims that he can't really remember. So, basically, the gist of the testimony, it's very hard to discern. But he does at one point say that the headmaster filed—somehow a report got from the headmaster to the police. But then he later backs off of that and seems to indicate that it's not. So the record does not make that clear. But so, the board wasn't saying here that he was required to report something. The acquiescence has a very specific definition. The Senate, when it ratified CAD, and the regulations make clear that what they have to look at is, did the authorities—were they aware of the torture and did they breach a legal duty to intervene? So when somebody claims, as Petitioner did, at least at one point, that it was reported, well, the agency has to examine that. That's not requiring somebody to report. They're looking at the evidence to say, well, what is the likelihood that this is going to repeat? In other words, if the evidence, for example, showed that the government did acquiesce to this harm, that would inform the analysis as to whether they might be likely to do it in the future. So it's not an error for the agency— I'm kind of confused at this point, though, because if it was reported to the police, there's no evidence that the police did anything, is there? Why wouldn't that show more acquiescence? That's not what the evidence shows, Your Honor. What Petitioner ultimately admitted is that he didn't remember. So we don't really have any evidence either way. And remember that in an application for cat protection, the burden of proof is on the applicant. So when— So why does that take us—why does that take us outside of Bringus? I'm confused about why this is different. Why this child would be in a different position than the other. Bringus was talking about an individual, a child, who didn't report to the authorities. And you can certainly understand why a child who underwent some sort of sexual trauma didn't report, why it wouldn't be reasonable to expect him to sort of fill in that gap. But here we have somebody who claims that he did report, at least to his parents and the headmaster. Well, that's relevant only, it seems to me, in determining whether the BIA somehow required him to do more than he actually did. And I don't see that. Exactly, Your Honor. They simply recounted as a fact that he doesn't know whether the police did anything or they didn't. And it's just a statement. They didn't require him to do it or think less of his—to my way of reading it, think less of his claim on the possibility that he didn't. And so to me, that's the distinction. That's exactly right, Your Honor. And even putting all of that aside, Your Honor alluded to this in the opening presentation. This, even if you thought that this past harm constituted torture and that it somehow met the state action requirement, it still presents the problem—I have to correct something that was said in the opening presentation. In an asylum and withholding of removal claim, if somebody presents evidence of past persecution— There's a presumption. There's no presumption in CAT. I misspoke. Yeah, that's true. And so—but that doesn't mean that past torture can't be relevant. Obviously, if somebody's been tortured in the past, that might inform the analysis as to whether they've been—would be tortured in the future. But this is really a quintessential example of past evidence, even if you thought that it amounted to torture, that doesn't really inform the analysis for the reasons Your Honor and the Board alluded to, which is that it happened 40 years ago. We know he's not going to be back in a private boarding school. The perpetrator of the harm—I mean, we don't know—they may not even be alive. This is so long ago. So this—you know, the petitioner is trying to show that he's individually at risk because of this past event, but it doesn't really inform the fundamental question which the agency has to answer, which is, does he face a clear probability in the future of facing harm? So really what that leaves the petitioner with is his second sort of portion of evidence, which are the country conditions reports and the background materials. And essentially, because this individualized harm doesn't help him, he essentially has to show that those country conditions reports in and of themselves demonstrate the clear probability of torture. And I think as the immigration judge and the Board went into some detail about, the evidence simply doesn't show that here. Of course, my colleague in the opening presentation pointed to a lot of the record evidence that shows that there are significant problems, and the government agrees that there are significant problems for the LGBTQ community in Jamaica. I mean, nobody can deny that. But the question is whether an individual would face a more likely if not chance of torture by the Jamaican government or with the consent or acquiescence of the Jamaican government. And while my colleague has pointed to much of the evidence in her favor, she really hasn't put a lot of emphasis on the countervailing evidence in the record, which the Board and the immigration judges were obligated to look at. Judge Graber, you mentioned the Bromfield case, and the government agrees that when These are adjudicated on a case by case, and the evidence in this case is certainly very different than that which was presented in Bromfield. One of the concerns that the court had in Bromfield, and that's specifically discussed in the decision, is the court was very concerned that the immigration judge in Bromfield didn't even acknowledge that there was this anti-buggery law that was passed by the Jamaican government. And the court went on to explain that there was no evidence in that record that showed that this was just simply a law that was on the books that was unenforced. So, they were very concerned about that. Well, that's the exact opposite of what we have here. Not only did the Board and immigration judge acknowledge this law, but we have a State Department report which indicates that the law is not enforced except in cases of non-consensual sex and child molestation cases. So, the very concern that was in Bromfield, we have evidence that alleviates that concern in this particular case. So, that's one example of how the record is demonstrably different than that was in Bromfield. I would also point out that Bromfield was a case from many years ago. I think it was a 2008 case, and they were looking at evidence from 2005. Well, much of the evidence in this case obviously comes well after that. Specifically, the Human Rights Watch report, which talks about a lot of the progress that's been made by the Jamaican authorities. Now, when I say there's progress, I don't mean to suggest that they're all the way, or that this is some wonderful place to be an LGBTQ person. I mean, the Board went so far as to acknowledge that there is a general possibility of torture in Jamaica. That's no small thing. And I certainly think that, you know, when you put the law aside just as a reasonable person, it's concerning to send somebody back where there might be a general possibility of torture. But when we're talking about torture claims, we have to take into account the burden of proof. Certainly, the immigration judge and the Board have to take into account the burden of proof. And while it may be an onerous burden of proof, I do believe that a reasonable fact-finder could take a look at a lot of the reforms that the police have made and reach the conclusion that there isn't a more likely-than-not chance. That torture is somehow an institution in Jamaica so pervasive that anybody just going back, any gay person or any LGBTQ person going back to Jamaica is more likely than not to face torture. Now, there is one case that I would— Yes. Often, the two parts of this get said at the same time. So there's the more likely-than-not-to-face torture and then there's the question of government acquiescence. And it seems like a lot of what you were just talking about is country conditions have changed as to government acquiescence. But then you kind of ended with it's just not 50 percent anyway. Do you understand the Board to be saying there's just not a 50 percent chance likelihood of torture regardless of government acquiescence or not? Or do you think it's really resting on the government acquiescence point? The way I read it, it looks a lot like they were resting on acquiescence because all of the specific citations in the record that they provide in the report are talking about police response or government response. I'm not sure I read the Board's decision the same way. I'm looking at AR-6 where the sentence that you were referring to, the first half, while the respondent's evidence shows a general possibility of torture in Jamaica, it does not show that he would be more likely than not, that he would more likely than not be a particular target for torture. So it seems to me that that is also a finding or a conclusion that they're looking at both prongs. Am I wrong about that? No, you're not wrong about that. That's my mistake, Your Honor. Now, there is one case that I would point, Your Honor, to. I'll readily acknowledge that it's not binding on this Court. It's a Seventh Circuit case cited in the government's briefing. It's a case called Bernard v. Sessions. Again, it's not binding. And even cases in this Court that deal with this are of limited value when they're binding precedent anyway just because every case is looked at based on the record that's presented in each case. But the reason I would point you to this case is because it bears a lot of similarity to this case. In that case, the Seventh Circuit was looking at country conditions evidence that is extremely similar to this one. Here is the way the Seventh Circuit described it. They said, The First Pride Parade recently was held without incident. Several government offices and officials have become calling for reform, and some police officers have started helping LGBT individuals subjected to violence. That could be easily used to describe the evidence in this case as well. And I would point out that the Seventh Circuit case was a stronger case for the petitioner. In that case, the individual had useful individualized evidence because he was claiming that his family was threatening to harm him because of his bisexuality. So, that person actually had individual type of risk as well, whereas the petitioner's attempt to show individualized risk here is really not all that pertinent because it was so long ago and there are going to be different actors and all for all the reasons we already discussed. So, while I understand that no case is binding, every case is going to look at the specific individual evidence in the record, we think that the Seventh Circuit's decision on this from 2018 is very, very closely aligned with this case and therefore constitutes significantly persuasive authority on the matter. So, unless there are any further questions about the specific evidence in the case, oh, I do want to mention one more thing. The petitioner had raised what is now becoming a stock argument about aggregation. They claim that the petitioner didn't aggregate the risk. Aggregation isn't a concern in this case because the petitioner is not claiming harm based on different theories of torture. He's claiming harms from different sources. He's claiming the police and then rogue private actors will harm him, but it's for the same reason. They're all going to go after him because he's a gay man, right? So, we're not dealing with separate theories of torture. So, in order to, I guess, properly aggregate that, all the board has to acknowledge is that there are these two separate sources of harm, which the board did specifically in the language of the decision. But aggregation isn't a concern unless you have actual separate theories of torture. The petitioner isn't presenting that. He did actually below, but he did at one point claim that he was going to be tortured because of his disability, but he did not raise that claim on appeal to the board, and the board in his decision pointed out that he had waived that claim. So, he only decided to move forward on one theory of persecution, albeit with two different sources of harm, but it was the same theory. So, there's nothing unreasonable about the board or immigration judge just examining what happens to gay people or what does the evidence show might happen to a gay person with respect to torture. And so, it was looking at both police and the general conditions about what happens. So, there's not really an aggregation concern that you would have in a case, for example, like in Velasquez, San Mayo, where you have separate strains or separate theories or where you have a case where somebody's saying, well, on one hand, the gangs are going to come after me for this reason, and on another hand, the cartels are going to come after me for this reason. It's the same theory of torture for both sources of persecution. And I would also point out that just saying, you know, he's claiming to fear the police and people who are not the police. So, I mean, that's basically another way of saying everybody. I mean, either you're in the police or you're not the police. So, this just isn't a case that implicates aggregation. So, with that said, now I'm out of time. So, unless the court has any further questions, the government would submit on the briefs.  Thank you, counsel.  Thank you for your time, your honors. Thank you. I'd like to make three points on rebuttal. First, it bears repeating that the BIA here applied the wrong standard. This court held in Hoshiwa-Taimez v. Barr that when the agency's analysis strongly indicates that it applied the incorrect standard, that is error. That requires remanding for application of the right standard. Even if it has the same in Hoshiwa v. Barr, it articulated the correct standard but then applied the wrong one. That is what we have here. Second, I have not heard the government once mention Avendano. And I think Avendano is important here. When you look at the past torture that Mr. Griffiths experienced, and we can debate the point about reporting to the police, the government now seems to be arguing for the first time that it maybe was reported to the police and that somehow that doesn't show acquiescence. But I agree with Judge Friedland. It seems like that would further support a finding of acquiescence. But if one accepts, as we think the record supports, that Mr. Griffiths was tortured as a child, that should be the principal factor under Avendano that this court considers in evaluating his risk of future torture. And finally, on the country conditions, the government mentions countervailing evidence and that Human Rights Watch report, but it does not actually cite any evidence that the situation in Jamaica has changed for gay men. That same Human Rights Watch report notes that policy and practice remain far apart. The two reform on which the IJ and then the BIA and now the government hinge their analysis on have not changed the life of Jamaican gay men. They continue to be beaten, stoned, raped with police willful blindness and acquiescence to this violence. Can I just ask you to articulate again what you think the legal error was that the BIA made? Sure. We think the legal error was to apply the asylum and withholding standard by treating first whether there was an individualized risk and then whether there was a pattern or practice. That is simply not what is required under CAT. The BIA had to look at the totality of the circumstances, at all the evidence in the record, and to consider when you look at that taken together, when you look at his past torture, his present condition that makes him just as vulnerable to torture, and the country conditions which this country has held in Aguilar Ramos alone can be sufficient to support a CAT claim. I think that compels the conclusion that Mr. Griffiths is more likely than not to be tortured, and at the very least it requires remand to apply the right standards in evaluating his claim. Unless there are any further questions. Thank you. Thank you both sides for the very helpful arguments in this case, and thank you for doing this case pro bono. It helps our court tremendously. Thank you all, and that's the last case on calendar. So this case is submitted and we're adjourned for the day. All rise.
judges: GRABER, FRIEDLAND, and MILLER